THE MAYOR AND COMMON COUNCIL OF THE TOWN OF
BOONTON

*v.*

THE BOONTON WATER COMPANY and the UNITED WATER
SUPPLY COMPANY.

[Argued and decided December 16th, 1904.]

1. Where, prior to the making of a contract between a town and a water company, the common council of the town was furnished with a plan showing elevations, &c., which disclosed that the top of the dam retaining the supply was but slightly higher than the higher parts of the town, the latter was charged with notice that the pressure at the higher parts of the town would be weak, and that the use of water throughout the town would diminish to some extent such pressure, but it was not charged with notice that the use of water as contemplated by the contract would entirely prevent the flow of water in fire hydrants in such higher portions.

2. Where, prior to the organization of a water company to furnish water to a town, its promoters made a contract to furnish the town with water for a specified period at specified rates, all of the covenants in the contract which were of a continuing nature ran with the water works, and were binding on a new corporation subsequently formed, to which the works were transferred, though some of them did not expressly purport to bind the original corporation's assigns.

3. A contract by a water company to furnish a town with water, providing for a supply "for domestic purposes, the extinguishment of fires and other lawful uses," and also "for public and domestic uses and purposes of the inhabitants" of the town, did not authorize the corporation to furnish water for the driving of printing presses, fans and other mechanical purposes, nor to supply railroad engines, to the prejudice of the inhabitants of the town for domestic and fire uses.

4. A schedule of rates attached to a contract for the supply of water to a town, containing an item "special rates, including hydrants in yards, hotels, boarding-houses, stables and business and factory use," related to the use of water for domestic purposes in factories and places of business, such as drinking, washing, flushing closets and the like, and did not authorize the sale of water to such factories, &c., to furnish power, to the prejudice of the inhabitants of the town for domestic and fire uses.

On final hearing on bill, answer and proofs.

*Mr. John B. Vreeland* and *Mr. Elmer King,* for the complainant.

*Mr. Willard W. Cutler,* for the defendants.

PITNEY, V. C.

This is a bill by the mayor and common council of the town of Boonton against the Boonton Water Company and the United Water Supply Company, its successor in title, asking for relief based on the terms of a written contract entered into between the complainant and the Boonton Water Company on the 14th of January, 1893.

The bill is, in effect, a bill for the specific performance of that contract.

It was and is what is called and known as a continuing contract, in which the water company agreed, for a term of years, to perform a certain duty, and the city agreed to pay a certain compensation therefor.

It is not the sort of a contract which can be decreed to be specifically performed in the sense in which that word is generally used, but it is quite clear, I think, and it has not been disputed by counsel, that the court may exercise a jurisdiction by way of applying and enforcing a preventive remedy to deter the defendant from either openly breaking it or from disabling itself from performing it.

There is no dispute as to the contract being in force. It is not suggested that it has either lapsed or been released.

The bill is not intended, of course, to remedy any actual damage that has occurred to the city or any of its inhabitants by reason of the alleged breach of the contract, but it is a bill to prevent possible or probable future injury.

The complainant, as a party to this contract, occupies the position of a trustee for the inhabitants at large of the town of Boonton, and it is its plain duty to protect the rights of the inhabitants of Boonton, the public, the community, in so far as they have rights under that contract.

Before looking at the terms of the contract, I will state the circumstances out of which it arose.

The town of Boonton is situate on the Rockaway river, on rather a steep side hill, and is one that it is difficult to supply with water by gravity. Mr. Van Duyne, an enterprising gentleman—civil engineer, by profession—conceived the idea of supplying it, and for that purpose acquired control of a brook called Stony brook, coming through a valley called Brook valley, about four miles north of Boonton. (Also of the ground and bed of the brook.) He then applied to the municipal authorities to enter into a contract authorizing a corporation preliminary to doing any work toward executing any plan.

This he was obliged to do.

In the first place, he could accomplish nothing without a corporation, for the reason that a private individual could not become the owner of the rights necessary to acquire and hold in order to supply a town with water.

In the next place the act of the legislature, under which an incorporation must be had, requires that the certificate of incorporation shall be accompanied with the consent of the municipality which the proposed corporation intends to supply with water, and the supreme court has held that without such consent the certificate of incorporation has no vitalizing effect and no corporation ensues.

In the third place, another section of the act provides that no pipe shall be laid by such corporation in any of the streets of the municipality without the consent of the municipal authorities.

Moreover, one source of income for one of these water companies is the annual payment to be made by the municipal authorities in behalf of the inhabitants for the supply of water for the extinguishment of fires and for street sprinkling and the like; and any incorporated company that undertakes to supply a town with water is usually careful at the very start to secure by contract an annual payment for' what is called fire hydrant service.

So Mr. Van Duyne applied to the corporate authorities of Boonton to make a bargain to supply the town with water by a corporation then presently to be formed, and the result was the contract in question, dated as we have seen the 14th day of Jan-

uary, 1893, between Van Duyne of the first part, the Boonton Water Company, then about to be organized, of the second part, and the mayor and common council of the town of Boonton of the third part.

Its preamble recites that the town desires to procure for the present and future needs of the town a supply of "pure and wholesome water for domestic purposes, the extinguishment of fires and other lawful uses," and that Van Duyne has offered to supply a certain quantity of water of that character, and to construct or have constructed such works as may be necessary to deliver the water thus to be furnished, &c.

Then the covenants are that the water company shall procure and furnish the town of Boonton during the period of ten years and during the continuance of the contract "a full, ample and sufficient supply of water, namely, five hundred thousand gallons per day, and to be increased to one million gallons per day if required, for the extinguishment of fires and other public and domestic uses and purposes of the inhabitants of the town of Boonton, to be derived from a reservoir, whose out-take shall be at an elevation of six hundred and twenty-five feet, and the water level, when filled, shall be at an elevation of six hundred and thirty-five feet" above tidewater.

"Such supply of water to be delivered by the party of the second part to be carried and delivered by means of cast iron and wrought iron water mains and pipes of proper strength and calibre and laid in the streets and highways" as designated by lines on a map.

By a further section it is provided "the said water shall be furnished for the extinguishing of fires and the sprinkling of streets through at least fifty-five fire hydrants, which are to be placed wherever designated by the mayor," &c. Then follows a statement of the amount of rent to be paid for each hydrant.

Further on it is provided that the water company "shall not furnish water to parties outside the corporation limits of the said town of Boonton as now constituted or as may be hereafter constituted;" and it was further provided that the water company should not sell any of its supply to any other water company, works or system.

The contract being entered into and the necessary assent of the corporation being given in order to give vitality to the water company when its certificate of organization was filed, Mr. Van Duyne was ready to proceed, which he did by first locating his dam in Brook valley, and fixing its top at six hundred and thirty-seven and one-half feet above mean tide, two feet and one-half above the contract head, and then ran a level around to the town, and ascertained the comparative height of each street crossing in the town, and marked the height on a map of the town made for that purpose, and also the hydrostatic pressure at that point in pounds to the square inch, and furnished the corporate authorities with a copy of this map and asked them to locate the fifty-five hydrants which they had contracted for, so that he could add to his specifications for piping the town, the proper special pieces called T pieces necessary for the hydrant connections.

He also laid down on this map the mains of various sizes to be laid throughout the town. So that the municipal authorities were fully advised of what the hydrostatic pressure would be at each point, and what would be the size of the mains laid through the streets, from which the hydrants would be supplied with water.

But at this point two observations are proper to be made:

*First.* That it does not appear that the municipal authorities were informed of the size of the mains which were to be used in carrying the water from the dam over the four miles intervening distance between it and the corporate limits. And *second,* they employed no hydraulic engineer, but relied, naturally, upon Mr. Van Duyne's representations, and were quite inexpert as to the difference between hydrostatic pressure and hydraulic pressure, involving, as the latter does, the loss of head due to friction of the water in passing through the pipes.

With this map before them, which I am sorry to say has been lost, and with Van Duyne to aid them, the municipal authorities proceeded to locate the fifty-five fire hydrants at points ranging, at the highest part of the town, at eight pounds pressure to the square inch up to eighty or one hundred pounds to the square inch.

Now, right here the common council are clearly chargeable with notice that the pressure at the higher parts of the town would at best be very weak and quite insufficient for the supply of hose to extinguish any fire in the few buildings in that neighborhood, and I further suggested, during the progress of the evidence, that they were also chargeable with notice that the use of water throughout the town would diminish that head somewhat. But I do not think they are chargeable with notice that it would be diminished to the extent to which the proof proved that it was afterward diminished.

With the fire hydrants so located the work of constructing the works was proceeded with, and in August, 1895, they were declared completed and the water was turned on.

A committee of the common council, with either the original map or a schedule taken from it, proceeded with a pressure gauge to test the pressure at each hydrant, and see if it corresponded with Van Duyne's figures found on his map, and it was found that the pressure corresponded substantially with the figures on that map.

At this time very few water taps had been put in, but connections were afterwards made from time to time, and then, in order to encourage the use of water and increase its income, the company let out water in the lower parts of the town, where the pressure was great, for the purpose of driving water wheels or motors to drive printing presses and air fans for cooling retail stores and saloons, and also for supplying hat factories for the washing of hats, and finally they undertook to supply the Delaware, Lackawanna and Western Railroad Company with water for its engines which passed Boonton on its main line.

With regard to the supply to the railway, it is proper to remark that its station was on the side of the Rockaway river opposite to the main town, and the supply was furnished by a main which ran up Main street towards Powerville, crossed the river at quite a high point, then turned down the river, supplying a residential part of Boonton on that side of the river, and reaching the railway station at the end of that long detour.

The result was that when the water was running to the railway tank the inhabitants of that residential part of the town were substantially without water.

Besides these uses of water, the company allowed the majority of its water takers, amounting to over two hundred, to be furnished with hose connections for lawn sprinkling, and the evidence tends to show that in dry weather large quantities of water were used for that purpose.

Then again the company extended its mains to a section known as South Boonton, not within the original corporate limits, and took in a large number of consumers there.

The result of all this increase was, that, after a few years, there was absolute absence of water in several of the fire hydrants in the higher sections of the town. The proof showed that the ordinary use of the water during daytime, or rather during the time between two and four o'clock in the afternoon, when the greater number of locomotives were supplied, reduced the level of the water in the mains forty and sometimes fifty feet below the level of the water in the reservoir, that is, forty or fifty feet below the static pressure, causing a loss of about twenty pounds to the square inch of pressure.

This was not due to a lack of water in the reservoir, but to the insufficiency of the calibre of the main (or some obstruction or leak therein) which brings the water down from the reservoir to the corporate limits. This is the principal cause.

In addition to these causes, in some of the streets the mains are altogether too small. For this defect the corporate authorities are somewhat to blame. They should have employed a hydraulic engineer to advise them on that part of the contract which fixed the size of the mains in the streets.

Returning to the size of the main conduit between the dam and the corporate limits or point where the mains are first bifurcated, and which is the lowest part of the town, the proofs show this: that for nine thousand four hundred feet the water is carried through a fourteen-inch main on a very slight and gentle gradient. Thence it runs two thousand two hundred feet through a tunnel cut through solid rock in the mountain, and the proof is that the water over this tunnel never falls more than one foot below the level of the water in the dam. From there it is carried one thousand two hundred feet in a twelve-inch pipe, and from there, unfortunately, it is carried thirteen thousand

feet, or nearly two and one-half miles, through a ten-inch main; and the tables agree that the friction due to carrying a million gallons a day through this series of mains will require about forty-five feet of head to overcome it.

Mr. Van Duyne estimates that, at times, the company has been delivering water at the rate of one million gallons a day. Moreover the contract, as we have seen, provides for that quantity, but it must be borne in mind that in order to supply that amount for domestic uses in twenty-four hours the appliances must be large enough to carry fifty per cent. more than that amount, because the use is concentrated in about twelve or fourteen hours.

It came out pretty clearly during the production of the evidence that the engineer who fixed the size of the main at ten inches made the radical mistake of supposing that, as the principal draft of water would be made from the mains in the lower section of the town near the end of the ten-inch pipe, such draft would not seriously affect the height to which the water would rise in the higher portions of the town.

This notion was thoroughly exploded by the engineer employed by complainant for the purpose of this suit.

If the water is maintained in the higher sections of the town at its static pressure, then there can be little or no head at all to drive any water through the pipes, and the moment they are opened at the lower sections of the town and any considerable amount of water is attempted to be drawn, the water must recede from the upper section of the town sufficiently to produce the head necessary to create the flow of water, and this was proven by actual experiment made by the present engineer of the water company.

This scarcity of water in the upper part of the town at some hours of the day and in the portion lying west of the city, led to disputes and differences between the corporation and the water company, and promises were made on behalf of the water company to take measures to improve the conditions.

Among other things an additional four-inch main was laid from the lower section of the town across the Rockaway river to the railway station, there connecting with the four-inch main

that reached the station from the main in the northwesterly part of the town. The result was to relieve, in some measure at least, the part of the town lying west of the river, but it could and did have little or no effect upon the higher portions of the town.

But the difficulty in the principal part of the town was not thereby entirely remedied.

I will not here go over and repeat the different actions taken by the common council at various times to induce the water company to remedy this difficulty, which was all the while increasing. Some of their proceedings were relied upon by counsel for the defendants as a sort of conditional approval in advance of certain measures which the water company agreed to take to remedy the deficiencies. It is enough to say that I have carefully considered them and find nothing in them to estop the complainant from seeking such remedy as the courts may afford it under the contract.

Finally the water company brought suit at law to recover the rent for certain fire hydrants for which the complainant refused to pay, on the ground that they were valueless, and that provoked the bill in this cause, which complains that the water company is failing to fulfill its contract and is disabling itself from properly supplying the town in several ways.

*First.* By selling and delivering water outside the corporate limits. This was done by the water company to a considerable extent to a section known as South Boonton, but after the bill was filed, as I believe, that section was brought within the corporate limits. All other breaches of that part of the contract were waived at the hearing.

*Second.* By selling water to the Delaware, Lackawanna and Western railroad; and

*Third.* By selling water for mechanical purposes and for manufacturing purposes and thereby diminishing the supply to the town; and it prays that the company may be restrained from using the water for those three purposes.

It appears that some time before the bill was filed a mortgage, given by the Boonton Water Company, was foreclosed, and the water plant brought to a sale and purchased by a new

company, the defendant, the United Water Supply Company. One point made by the defendants is that the new company is not bound by the contract of the first company.

I am unable to adopt that view. The contract of the first company is in effect a part of the very terms upon which the works were built, and the new company took them subject to those conditions.

It would be a strange condition of the law that would permit a water company, formed under our legislative system to supply a town with water, to avoid the effects of a contract entered into by it with the municipality preliminary to its incorporation, and escape obligation under it by placing a large mortgage on its works and allowing them to be sold under its foreclosure and purchased by a new company.

I am clearly of the opinion that all the covenants in the contract which are of a continuing nature—and all those here relied on are of that nature—run with the works and are binding on the new company, much on the same principle as covenants for rent are binding on the assignee of the lessee.

Counsel for the defendants, in his able arguments, distinguished between certain covenants which are declared to be binding on the assigns and certain others which are not so declared. His argument was based on the old maxim of *expressio unius exclusio alterius,* which, applied to this contract, means, he argued, that only such covenants could bind the assigns as were so expressly declared by the contract. I cannot think that that maxim applies here, and I hold that the present proprietors of the works are liable, as owners and occupants thereof, in this court on such of the covenants as I have above recited.

Another point made by counsel is that the supply of water to the hatmakers, and for driving printing presses and fans and other mechanical purposes, is within the terms of the covenants and the contract.

The preamble provides for a supply of water "for domestic purposes, the extinguishment of fires and other lawful uses," and in the third clause the covenant is "for the extinguishing of fires and other public and domestic uses and purposes of the inhabitants of the town of Boonton." Counsel relies upon the word "public."

I am clearly of the opinion that, taken in connection with the subject-matter, the words "public use" cannot be extended to mechanical purposes or manufacturing purposes. Those uses are what is termed private uses. The term "public use," in that connection, means such uses as benefit the inhabitants of the municipality at large as distinguished from those that benefit the individuals of a class, such as street sprinkling and washing and the extinguishment of fires, and perhaps lawn sprinkling.

But, be that as it may, I am entirely clear that by the true construction of this contract, taken in connection with the purview and policy of the act under which the defendants are incorporated, the complainant, in its corporate capacity, is entitled to the first lien and right of user of the supply of the defendant for the purposes of the municipality at large for extinguishment of fire, sprinkling of streets and for the domestic uses of the inhabitants, in preference to any use of any person for mere mechanical or manufacturing or other purposes. And this view is not altered by the language of the fifth section, which declares that "said supply of water shall be furnished by the said party of the second part to all the inhabitants of the said town of Boonton along the lines of the water mains, who may apply therefor," &c. The words "said supply of water" refers to the supply mentioned in the third section, which I have already commented upon. It would never do to so construe this contract that an inhabitant could set up a factory on the line of the pipe in the lower part of the town and take all the water that the main there supplied to run his factory and leave the rest of the town unsupplied.

Then the counsel for the defendant relies upon the schedule of rates annexed to the contract.

Now, the town had a right, before giving its assent to the defendants' corporate existence, to provide a schedule of rates, and such a schedule is annexed to the contract containing a list of different uses and different prices, everyone of them a domestic use, or what has been so held.

Added to that schedule is an item headed "special rates," and under it is this clause: "Special rates will be given for hydrants in yards, hotels, boarding-houses, stables, &c., and *business and*

*factory use."* The words relied on are "business and factory use." On the list to which prices are given there are none given for either hydrants in yards, hotels, boarding-houses, public stables, ordinary retail stores, ice cream, soda water or beer saloons, carpenter shops, blacksmith shops or factories. The reason for this is that the amount used in such places varies with the size of the establishment, and this provision is quite common in schedules of water rates.

Counsel naturally relied upon the word "factories," but the use of that word in that connection does not, to my mind, indicate anything more than that the water should be used by the occupants and workmen of the factories. It does not convey, to my mind, the idea that the water was to be used for supplying power to propel machinery, either in the factory or the printing office, or to drive fans in the saloons. In short, I think the words "business and factory use" are confined to domestic uses as found in factories and places of business, namely, drinking, washing, flushing water-closets and the like. · It would be quite impracticable to make a list and annex it to the contract of all the different kinds of factories and places of business that might need water, and I am therefore of the opinion that those expressions do not help the defendant, and that the defendant has no right to use any of its water for the supply of the engines of the railway company or the motors that drive the printing presses, or the ventilating fans, or any other mechanical purposes, or the washing of hats—I had some doubts of that at first, but reflection has removed it—so long as there shall be any deficiency of water in the higher parts of the town.

One other matter is to be noticed. After bill filed, defendant attempted to remedy the lack of water in the higher parts of the town by erecting a wrought-iron tank or water tower, twenty feet in diameter and twenty feet high, with a capacity of forty-five thousand gallons, in the upper part of the town, with its top precisely on a level with the top of the dam in Brook valley, and connected it with the system of mains at the highest point of the town, then inserted check valves in certain of these mains at such points as to create a high service area, which included several of the weakest fire hydrants. It then supplied that stand-

pipe by a small pump connected with the main outside this high service area. The result of this is undoubtedly to improve the flow at the high service area. But, after all, it is quite insufficient to meet the requirements of the contract.

In the first place, the area of the high service is not sufficient. It should have gone much farther down the hill and taken in a greater number of fire hydrants. For it must be borne in mind that the diminution of pressure below the static pressure, due to the natural head of the dam, which we have found is about eighteen or twenty pounds to the square inch, extends over the whole area of the town and seriously affects, not only those hydrants in the upper part of the town in which the experiments show that at times no water runs, but those a little further down the hill, where, although the water does run, it flows with a head eighteen or twenty pounds less than the contract, in substance, provides for, and the hydrants are rendered thereby so much the less serviceable.

In the second place, the size of the standpipe is so small that as soon as a fire hydrant is opened for use and a stream of water drawn·therefrom the head will begin to fall.

In the third place, without going into detail, I think the pumping apparatus and the means of supply in case of fire are insufficient.

I think it proper to remark that in some of the technical opinions which I have expressed I have relied somewhat upon my own technical knowledge of the subject, and this was done by consent of counsel on both sides.

I think the complainant is entitled to an injunction against the use of the water by the defendant for the purposes above mentioned and will advise accordingly, but I will suspend the operation of the injunction until the defendant has an opportunity to remedy the defects in its system, if it can, in such manner as to enable it to supply the town properly and continue its supply for the purposes mentioned.